PEOPLE *v.* RYCKMAN.
SAME *v.* DOMBECKY.
SAME *v.* RATLIFF.
SAME *v.* AITKEN.
SAME *v.* WHALEN.
SAME *v.* McLEAN.

1. CRIMINAL LAW—CONSPIRACY TO OBSTRUCT JUSTICE—POLICE OFFICERS—EVIDENCE.

In prosecution of six police officers and others for conspiracy to obstruct justice, testimony from which it may reasonably be inferred that payments made to them were for police pro-

tection of various ·gambling enterprises and as to identity of the police officers was sufficient to present question of their guilt or innocence for jury's consideration and sufficient to sustain conviction.

2. SAME—OPENING STATEMENT—EVIDENCE—VERDICT—PRESUMPTIONS.
A statement by the prosecutor that he expected to prove certain facts but not followed by proofs is not ground for reversal of a conviction if the statement was made in good faith as the jury must be presumed to have based their verdict upon the evidence and not upon the statement.

3. SAME—CONSPIRACY—OPENING STATEMENT—EVIDENCE.
In prosecution of a large number of defendants on charge of conspiracy to obstruct justice, the failure of the prosecutor to substantiate his opening statement as to a particular defendant did not constitute ground for mistrial as to such defendant where it is not shown that the questioned statement was made in bad faith or that the particular defendant was prejudiced.

4. INDICTMENT AND INFORMATION—CONSPIRACY—MULTIPLICITY.
Information for conspiracy to obstruct justice is not bad for multiplicity where misconduct charged is all germane to one course of wrongdoing.

5. CONSPIRACY—CONCERT OF DESIGN—PARTICIPATION.
Conspiracy implies concert of design and not participation in every detail of execution, and it is not necessary that each conspirator should have taken part in every act, or know the exact part performed or to be performed by the others in the furtherance of the conspiracy.

6. SAME—COMMON DESIGN—PARTICIPATION—EVIDENCE.
Where testimony shows there was one basic conspiracy and that defendant police officers actively participated in common design and purpose thereof to obstruct justice it was not necessary that they know other coconspirators or have knowledge of their activities or of the scope of the conspiracy; hence claims that the evidence presented by the prosecution showed a multiplicity of conspiracies and constituted an omnibus charge was without merit.

7. SAME—SCOPE OF PROOFS—VERDICT.
. In prosecution of 41 defendants for conspiracy to obstruct justice, contention that rendition of a fair jury verdict was a physical impossibility due to the number of defendants, the multiplicity of charges, broadness of scope of the prosecution

and length of time involved was not well taken by appellants
who had not moved for separate trials, jury which deliberated
at considerable length convicted 23 and acquitted 18 defend-
ants and the proofs necessarily included the activities of all
persons involved in the conspiracy.

8. CRIMINAL LAW—CONSPIRACY.—MISCARRIAGE OF JUSTICE.
   Failing to give requested charges, admission of evidence as to
   appellants and denial of their motions for new trial in prose-
   cution for conspiracy to obstruct justice where charge as given
   fully and fairly presented the questions of fact and the law
   applicable thereto and other claimed errors did not result in
   a miscarriage of justice (3 Comp. Laws 1929, § 17354).

Appeals from Wayne; Pugsley (Earl C.), J., pre-
siding. Submitted October 14, 1943. (Docket Nos.
86, 87, Calendar Nos. 42,086, 42,087.) Decided De-
cember 29, 1943.

Arthur Ryckman, Frank Dombecky, Marion Rat-
liff, John Aitken, Joseph Whalen, and Glenn D. Mc-
Lean were convicted of conspiracy to obstruct jus-
tice. Affirmed.

*George W. Schudlich (John G. Jefferson,* of
counsel), for appellants Ryckman, Dombecky and
Ratliff.

*Frederick J. Plotts (John G. Jefferson,* of coun-
sel), for appellants Aitken, Whalen and McLean.

*Herbert J. Rushton,* Attorney General, *Edmund
E. Shepherd,* Solicitor General, and *Thomas A. Ken-
ney* and *Daniel J. O'Hara,* Assistants Attorney Gen-
eral, for the people.

STARR, J. Upon jury trial defendants Arthur
Ryckman, Frank Dombecky, Marion Ratliff, John
Aitken, Joseph Whalen, and Glenn D. McLean were

convicted under the second count of an information charging them and others with a conspiracy to obstruct justice, and were sentenced as follows: Ryckman and Dombecky, each 18 months to five years; Ratliff, six months to five years; Aitken, Whalen, and McLean, each two years probation and $500 costs. Their respective motions for new trials were denied, and, having obtained leave, they appeal. Their cases come to us upon the record presented in the separate appeals of John W. Roxborough and other defendants.* In this opinion we consider only the appeals of the six above-named defendants, all of whom were police officers of the city of Detroit. It is unnecessary to state the facts leading up to their indictment, trial, and conviction, as such facts are set forth in our opinion in the case of *People* v. *Roxborough, ante,* 575, and other cases therein referred to.

Defendants contend that the verdicts of the jury were against the weight of the evidence. Prior to his appointment as an inspector in 1938, defendant Ryckman was a lieutenant in the police department. It is unnecessary to narrate in detail the testimony presented against him. Suffice it to say that two witnesses who were connected with or engaged in the so-called mutuel or policy business testified that they paid various sums of money to Ryckman. From their testimony it may reasonably be inferred that such payments were for police protection. There was also testimony that, following his appointment as an inspector, Ryckman paid substantial sums of money to one Boettcher, who had recommended his appointment, and that such payments were divided between codefendants Reading and Ryan and other

* See *People* v. *Roxborough, ante,* 575; *People* v. *Watson, ante,* 596; *People* v. *Ryan, ante,* 610; and *People* v. *Reading, ante,* 616.—REPORTER.

persons. Ryckman did not take the stand in his own defense.

A witness who was engaged in the so-called numbers business in the "sixth precinct" in which defendant Dombecky was an inspector of police testified in part as follows:

"I first met Mr. Frank Dombecky in January, 1939. * * *

"After that meeting * * * I paid Mr. Dombecky $100 a month * * * until August, 1939. * * * I paid him this money for protection. * * *

"I would put it in the glove compartment of his automobile. · * * * I knew it was his car. * * *

"I met Inspector Dombecky * * * at the Falcon hall * * * at a party given in his honor. * * * We just talked about things in general and he told me he would call me or I would call him some time. * * *

"It was possibly a week after the party that I received this telephone call, * * * and the instructions that I received were that a certain car would be parked in front of the restaurant, and to put $100 in the glove compartment of the car, within the half hour, and I went right over with the money. Each and every month thereafter I got the same call from the same voice, * * * I would just go over there myself and see the car and put it (money) in. * * *

"I received Mr. Dombecky's license number from him, which I checked against the license of the car once or twice, that Mr. Dombecky was driving when I saw him, and which was the car in which I had placed the $100 in the glove compartment."

Defendant Dombecky did not take the stand, and such testimony regarding payments made to him for police protection stands uncontradicted.

Defendant Ratliff was a police officer on the so-called "clean-up squad" in the 13th precinct. Two

witnesses who were engaged in the numbers or policy business testified that they paid Ratliff sums of money, and from the circumstances shown it may reasonably be inferred that such payments were for police protection. Defendant Ratliff did not take the stand, and such testimony stands uncontradicted. The testimony of certain witnesses relative to their identification of defendants Ryckman and Ratliff in the court room could be considered by the jury in determining the guilt or innocence of such defendants.

One Fitzgerald, a police officer and member of the so-called racket squad, assigned to the policy and numbers business, testified against defendants Aitken, Whalen, and McLean, in part as follows:

"I had conversation with Joseph Whalen * * * with reference to taking money as a member of the racket squad. * * * Whalen and I talked about different fellows that were collecting money and we thought we might as well get in. * * *

"I have identified Mike Novak and I got money from him between February and August of 1939 about once a month. *Whalen, McLean,* Buck, Lester and *Aitken* went with me when I made those collections and we received $10 apiece. * * *

"Whalen, * * * McLean, Aitken, * * * and myself got $5 apiece from Mosley (who operated a mutuel and policy business) from February to August, 1939. * * *

"Hovey Cox' place * * * was a candy store, I believe, and Whalen, * * * McLean, and sometimes Aitken went up there with me on occasions and we would get $10 apiece from Cox, once a month from February to August of 1939. * * *

"I collected money from the Yellow Dog mutuel house from a fellow named Carter. Whalen, McLean, * * * and Aitken went with me on several occasions and we all received $5 each month per man

during February to August, 1939. To make these collections, anybody that was on the squad including myself, Whalen, Buck or Aitken, would go up to that address in the police car, ask for Carter, who ran a barber shop, * * * and he would come out and pay us the $5 in cash to the closest man to him of the men in the car. * * * We went to River Rouge on Eagle street also several months during that period to collect moneys. * * *

"I know Walter Norwood. He was in the mutuel business on Adams. * * *

"Whalen, * * * McLean and Aitken * * * as well as myself were getting $5 per man per month from Norwood. * * *

"When we first went to get the money from Claude Roxborough * * * McLean and Aitken told us to drive up in the •alley in back of some kind of real estate office on Beacon and Hastings. * * * There was just a conversation about these different numbers houses running and they were paying off every month, so we go out and get ours. * * * A written list of addresses was given to us, written by Whalen."

A witness engaged in the mutuel and policy business testified that he paid Whalen $10 a month when Whalen was on the racket squad. Another witness engaged in the numbers business testified that on several occasions he paid $20 to two police officers in a car and, in identifying defendant Aitken as one of such officers, he said:·

"I pointed Aitken out here today. * * *

"The man Aitken that I pointed out here in this court room today is the man Aitken that came on up to my numbers house and took money along with 'Dave Lester. * * *

"I think it is the man; I am not sure; I don't remember him wearing glasses, but I think he is the man."

Defendants Aitken, Whalen, and McLean, each took the stand in his own behalf and in substance denied the testimony presented against him and also denied that he had collected or received any money for police protection. Other police officers called as defense witnesses testified in substance that they had worked with defendants Aitken, Whalen, and McLean and never saw them take any money from policy or numbers operators.

The above-discussed and other testimony certainly presented questions of fact for jury consideration as to the guilt or innocence of these defendants. It saw and heard defendants and other witnesses and was in a better position to determine their credibility and the weight to be accorded their testimony. There was evidence from which the jury as judge of the facts could find these six defendants guilty beyond a reasonable doubt of the offense charged against them. The factual situation presented in the case of *People* v. *Hepner*, 285 Mich. 631, cited and relied upon by defendants, clearly distinguishes it from the present cases.

Defendants' contention, that the circuit court for Wayne county did not have jurisdiction of the offense charged, is determined adversely to them in our opinion in *People* v. *Watson, ante,* 596.

Certain of these defendants contend that the trial court erred in denying their motions for new trials based upon an alleged prejudicial statement by the prosecutor in his opening to the jury that other defendants had pleaded guilty. A similar motion was made by codefendant Everett I. Watson. For the reasons therein stated, our opinion in the case of *People* v. *Watson* determines this contention adversely to these defendants.

Defendants further contend that the trial court erred in denying their motions for new trials based

upon alleged discrimination by the prosecutor against Negro veniremen in summarily exercising peremptory challenges whenever a Negro venireman was called. Our opinion in *People* v. *Roxborough* determines this contention adversely to these defendants.

Defendant Dombecky alleges error in the denial of his motion for a mistrial based on the ground that there was no evidence establishing the following statement by the prosecutor in his opening to the jury:

"We will show you that Dombecky, Inspector Dombecky, was made an inspector during the regime of Richard W. Reading along about the same time that Boettcher was made an inspector, I believe along about May 1, 1938, and he had charge of No. 6 out here, McGraw station, and Dombecky paid each month into this pot from moneys—that is, he paid it in cash—and we will show you what the salary of a police inspector is, and we will show you it is around $4,000, or $5,000 a year, and that this money was paid in, and was used for the purpose of paying off public officials."

This jury trial involved a large number of defendants, and it is not surprising that the proofs did not in all instances substantiate the case the prosecutor expected to make. There is no showing that such opening statement was made in bad faith or that defendant Dombecky was thereby prejudiced. In *People* v. *Fowler,* 104 Mich. 449, we said:

"If this statement was made in good faith by the prosecuting officer, and on the trial he found that the proofs did not substantiate the statement, we do not think that, for that reason alone, the conviction should be reversed. The prosecuting attorney may not always find that the proofs will meet the case he expects to make when he makes his opening state-

ment to the jury, and it is not every failure of proof, under such circumstances, that warrants a reversal. *In this case the fact was not proved, and the jury must be presumed to have based their verdict upon the evidence, and not upon the statement of counsel.*"

See, also, *People* v. *Tenerowicz,* 266 Mich. 276; *People* v. *Swift,* 172 Mich. 473; *People* v. *Ecarius,* 124 Mich. 616.

We are satisfied that the denial of defendant Dombecky's motion for a mistrial did not constitute reversible error.

Defendant Ryckman alleges prejudicial error because the following statement by the prosecutor in his opening to the jury was not entirely supported by testimony:

"As I said to you yesterday, I will reiterate for a moment, that we expect to show as a part of this scheme, plan, and conspiracy, that Arthur Ryckman, who had been appointed inspector, was paying in to Boettcher each month in the sum of $1,250 that was going into this pot, and we will show you that Ryckman was collecting money from Norwood and Mosley in the 13th precinct, the Canfield station, they were paying him off for the privilege of operating or going through his precinct."

Witness Boettcher, an inspector of police referred to in the statement above quoted, testified in part:

"*Q.* Did you and Ryan have any talk about Ryckman prior to the time he was made an inspector?

\*    \*    \*

"*A.* Ryan and I talked about Ryckman and three other fellows, following which I talked with Ryckman. \*    \*    \* After Ryckman had been made an inspector in October, he paid me $1,500 and an additional $1,250, making a total of $2,750; $1,500 of it went to Reading, Sr.; $250 went to (Reading), Jr. and $1,000 went down town to the pool to Elmer

Ryan.  After this original payment, Ryckman paid me $1,250 each month.  *  *  *  The salary of inspector of police at that time was $4,180 a year. *  *  *

"I testified that I received $1,250 a month from Inspector Ryckman but I couldn't tell you if any of that money came from policy operators.  I don't know the source of that money."

In view of such testimony and no showing of bad faith or prejudice, such opening statement did not constitute reversible error.  See *People* v. *Tenerowicz, supra; People* v. *Fowler, supra.*

Defendants further contend that the case presented by the prosecution shows a multiplicity of conspiracies and "constitutes an omnibus charge" against them.  In *People* v. *Tenerowicz, supra,* we said, p. 282:

"If the misconduct charged is all germane to one course of wrongdoing there is only one conspiracy. It may be charged and punished as a single conspiracy."

In 15 C. J. S. pp. 1063, 1064, § 40, it is stated:

"Previous acquaintance between the conspirators is unnecessary, nor is it necessary that each conspirator should have seen the others, or have knowledge as to who all the members of the conspiracy are.  It is not essential that the parties meet or that they confer and formulate their plans, nor that each conspirator have knowledge of the scope of the conspiracy or the means by which the purpose is to be accomplished, nor that any time should have been set for the accomplishment of the design.  Neither is it necessary that the plan of a combination shall embrace in detail in its early stages the various means by which it is to be executed, as it is sufficient that there is a general plan to accomplish the result sought by such means as may from time to

time be found expedient. Conspiracy implies concert of design and not participation in every detail of execution, and it is not necessary that each conspirator should have taken part in every act, or know the exact part performed or to be performed by the others in the furtherance of the conspiracy."

See, also, *People* v. *Garska,* 303 Mich. 313; *People* v. *Chambers,* 279 Mich. 73; *Marino* v. *United States* (C. C. A.), 91 Fed. (2d) 691 (113 A. L. R. 975); *Lefco* v. *United States* (C. C. A.), 74 Fed. (2d) 66.

In the present case there was one basic conspiracy, and its common design and purpose was to obstruct justice. The testimony shows that these six defendants actively participated in such common design and purpose. It was not necessary that they know other coconspirators or have knowledge of their activities or of the scope of the conspiracy. We find no merit in their claims that the evidence presented by the prosecution shows a multiplicity of conspiracies and constitutes an omnibus charge.

These defendants further contend that the rendition of a fair jury verdict was "a physical impossibility due to the number of defendants, the multiplicity of charges, the broadness of the scope of the prosecution and the length of time involved." This contention was well answered by the trial judge who, in denying motions for new trials, said:

"The claim that it was impossible to obtain a fair verdict is met by the fact that the jury had only one count to consider—only one conspiracy contained in that count—and was able to so analyze and catalog the testimony as to result in the conviction of 23 and the acquittal of 18 defendants. The jury was out a considerable length of time and had the opportunity to and apparently did consider the case of each individual defendant, resulting in the aforesaid verdict. In the opinion of this court this verdict was an intel-

ligent. and fair disposition of the rights of all defendants.''

As these defendants did not move for separate trials, they are not in a position to complain of the number of defendants- tried with them. Their objection to the scope of the prosecution and the length of time involved in the trial is without merit. They, together with many others, were charged with a conspiracy to obstruct justice, and the scope of the proofs necessarily included the activities of all persons involved in carrying on the common purpose and design of such conspiracy.

Defendants claim that the trial court erred in failing to give certain requested charges. As the charge given by the court fully and fairly presented the questions of fact and the law applicable thereto, there was no error in failing to give the requested charges. We have examined the record and find no error in the admission of evidence relative to these defendants. Their motions for new trials were properly denied. Other errors assigned or questions presented do not merit consideration.

We find no error in the trial of these defendants which resulted in a miscarriage of justice. 3 Comp. Laws 1929, §17354 (Stat. Ann. § 28.1096).

The conviction of each of these defendants is affirmed.

BOYLES, C. J., and CHANDLER, NORTH, WIEST, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.