PEOPLE *v.* HEIDT.

1. CONSPIRACY—INFERENCES.

A criminal conspiracy may be established by circumstances and may be based on inferences.

2. SAME—EVIDENCE—COMMON DESIGN—ACTS OF INDIVIDUAL CONSPIRATORS.

In a prosecution for a criminal conspiracy a prima facie case of conspiracy must first appear to the trial court before he may submit to a jury evidence of the acts and declarations of alleged coconspirators as the common design or concert in a common enterprise is the only basis for the admission of such acts and statements.

3. SAME—USE OF ACT OR DECLARATION OF ONE CONSPIRATOR AGAINST OTHERS.

Before one defendant in a prosecution for conspiracy is bound by any act or declaration of any other defendant, it is necessary to find that the defendant to be bound by such act or declaration was a party to such conspiracy with the defendant doing such act or making such declaration in furtherance of the object of the conspiracy.

4. SAME—EVIDENCE—INSTRUCTIONS.

In prosecution for conspiracy to obstruct justice, general charge to jury as to binding effect of acts and declarations of individual conspirators upon codefendants *held,* fully as favorable to the defendants as they were entitled to have.

5. SAME—INSTRUCTIONS—TESTIMONY OF ACCOMPLICE.

On appeal of one of 27 defendants convicted of conspiracy to obstruct justice in prosecution of 67 wherein 26 others were acquitted, charge of court specifically requiring jury to find that appellant was connected with and participated in conspiracy by evidence independent of testimony of an accomplice and requiring jury to examine such accomplice's testimony carefully *held,* proper.

6. SAME—HEARSAY—OTHER EVIDENCE.

　　Reception of so-called hearsay testimony of a coconspirator *held*, proper in prosecution for conspiracy to obstruct justice where, aside from such testimony, there was an abundance of testimony tending to establish facts and circumstances from which jury could conclude appellant was a coconspirator with other defendants, knowingly and wilfully conspired to obstruct justice as charged, and actively participated in such conspiracy, notwithstanding appellant's testimony denying any connection with the conspiracy and the testimony of such coconspirator.

7. SAME—CREDIBILITY OF WITNESS FOR JURY.

　　The measure of credibility to be given the testimony of a coconspirator or any other witness in a prosecution for conspiracy is for the jury.

8. SAME—SUFFICIENCY OF EVIDENCE.

　　On trial of some 67 defendants in prosecution for conspiracy to obstruct justice wherein appellant was one of 27 convicted by jury which acquitted 26 others, evidence was sufficient to submit issue of appellant's guilt to jury, to support trial court's denial of his motion for a directed verdict and to support verdict.

9. SAME—REFERENCES TO OTHER SIMILAR CASES.

　　In prosecution for conspiracy to obstruct justice by some 69 defendants, 2 of whom elected to be tried by the court, various references to another prosecution for a similar conspiracy in same county of which certain persons were convicted *held*, not to have constituted reversible error where some witnesses testified in each case, some persons were defendants in each case and much of the testimony pertaining to the other conspiracy was given by two witnesses without any objection having been interposed by appellant or his counsel.

10. SAME—EVIDENCE PERTAINING TO OTHER DEFENDANTS.

　　In prosecution for conspiracy to obstruct justice by appellant and various other defendants, there was not a fatal and material variance between the charge alleged in the information and the evidence adduced where the testimony introduced which had a bearing upon the issue as to whether appellant was one of the coconspirators was clearly within the charge set forth in the information, the mere fact that some testimony was received relevant to other defendants not being reversible since that is an unavoidable circumstance arising by reason of the fact that a conspiracy is a partnership in criminal purposes and is not a one-man affair.

11. SAME—EVIDENCE—OBSTRUCTING JUSTICE—COMPETENCY OF EVIDENCE.

In prosecution for conspiracy to obstruct justice wherein it was the theory of the prosecution that there was one general conspiracy, that it was a continuing one, and that some defendants dropped out and others dropped in, but that its purpose was the same throughout its existence, acts shown to have occurred at different times and in different localities within the county which were germane to the general conspiracy charged whereby appellant and others sought to obstruct justice by permitting the operation of handbooks in the county did not establish several separate and distinct conspiracies.

12. INDICTMENT AND INFORMATION—CONSPIRACY—DUPLICITY.

An indictment for conspiracy to obstruct justice is not bad for duplicity merely because it relates to more than one offense where the misconduct charged is all germane to one general course of wrongdoing.

13. CONSPIRACY—COMMON DESIGN—PARTICIPATION—EVIDENCE.

Where testimony shows there was one basic conspiracy and that defendant police officers actively participated in common design and purpose thereof to obstruct justice it was not necessary that they know other coconspirators or have knowledge of their activities or of the scope of the conspiracy; hence claims that the evidence presented by the prosecution showed a multiplicity of conspiracies and constituted an omnibus charge was without merit.

14. SAME—SCOPE OF PROOFS—VERDICT.

In prosecution of 67 defendants for conspiracy to obstruct justice, contention that rendition of a fair jury verdict was impossible due to the number of defendants and difficulty of discriminating between evidence implicating an individual and evidence consistent with his innocence was not well taken by appellant where jury convicted 27 and acquitted 26 defendants and proofs necessarily included the activities of all persons involved in the conspiracy.

15. INDICTMENT AND INFORMATION—CONSPIRACY.

An indictment may be as general and indefinite as the conspiracy sought to be punished.

16. CRIMINAL LAW—CONSPIRACY—JOINT TRIAL—EVIDENCE.

Appellant was not deprived of his constitutional right to a fair and impartial trial in prosecution for conspiracy to obstruct justice where he and 66 others were forced to go to trial together and testimony not only involved such other defendants

but also some 70 other persons not on trial and who offered no testimony in their behalf.

17. CONSPIRACY—PARTICIPATION.

One knowing that others have combined to violate law, who cooperates knowingly to further the object of the conspiracy, becomes a party thereto, though he is not acquainted with each of the other conspirators and may know but one of them.

18. SAME — OBSTRUCTING JUSTICE — POLICE OFFICER — PROTECTION MONEY.

In prosecution for conspiracy to obstruct justice, appellant, an officer in the police force, was properly convicted where it appears that he knowingly cooperated in an effort to operate handbooks in the county free from intervention of law enforcing officers in consideration of the payment of ''protection'' money.

Appeal from Wayne; Pugsley (Earl C.), J., presiding. Submitted October 11, 1945. (Docket No. 72, Calendar No. 42,282.) Decided December 3, 1945. Rehearing denied January 7, 1946.

William J. Heidt was convicted of conspiracy to obstruct justice. Affirmed.

*Louis J. Colombo, Jr.,* and *David H. Crowley,* for appellant.

*John R. Dethmers,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Daniel J. O'Hara,* Assistant Attorney General, for the people.

NORTH, J. Appellant, William J. Heidt, on trial by jury was convicted of conspiracy to obstruct justice as set forth in the second count of the information filed in this case in which a large number of alleged coconspirators were also made defendants. Prior to the trial of the instant case approximately 20 of the defendants so charged pleaded guilty; as to others, the prosecution was dismissed as a result of motions made in their behalf; and still others charged in the information were convicted before

the trial of this case in other cases arising out of the same or somewhat similar violations of law and therefore were not prosecuted in the instant case. As this case went to trial in March of 1942 there were 69 defendants, two of whom elected to be tried by the court and the remaining 67 were tried by the jury. Of those who went to trial before the jury, 14 were dismissed by the court, 26 were acquitted by the jury, and 27 were found guilty. Appellant was one of the 27 who were convicted.

In general terms it may be said that the alleged obstruction to justice is claimed by the prosecution to have resulted from a conspiracy among the convicted defendants to carry on in Wayne county in violation of law gambling of the type known as the handbook business; some of such defendants being the owners or operators of such handbooks, others being law enforcement officers who in consideration of "protection money" being paid to them desisted from enforcing against such owners or operators the laws which penalized gambling.

The fact that a conspiracy existed as charged in the second count of the information is not challenged by appellant, nor could it under this record be successfully challenged. But it is strenuously asserted in appellant's behalf that the testimony upon which the people relied is not sufficient to sustain his conviction as having been a party to the alleged conspiracy. In behalf of appellant it is urged that the people did not prove by competent evidence beyond a reasonable doubt that he knowingly and wilfully conspired to obstruct justice as charged, or that he had knowledge of such conspiracy, or that he actively participated in or did any act in furtherance of the alleged conspiracy. In this connection it is appellant's contention that "the only evidence adduced by the prosecution against the defendant, William Heidt, was that during the time the alleged

conspiracy was in operation, defendant occupied the position of assistant deputy superintendent of police with the duty of paying special attention to gambling, vice conditions and liquor conditions,'' and that such was not sufficient to establish defendant's connection with the alleged conspiracy, and was not of such a character as to justify the prosecution in offering proof of hearsay acts or declarations of other alleged conspirators to establish defendant's connection with the conspiracy, it being claimed by appellant there was no other independent evidence connecting him with the conspiracy. It is obvious that if the record does contain competent testimony, other than the so-called hearsay statements and declarations just above referred to, sufficient to justify a finding by a jury that appellant was a party to the alleged conspiracy, then appellant's position is not tenable; and further, if such competent evidence is found, under the well-established rule in this jurisdiction the challenged statements of other coconspirators were admissible in evidence.

As bearing upon the phase of this appeal just above noted, we find in this record the following. The information covers the period from January 2, 1935, to August 1, 1940. Appellant was a member of the Detroit police force from 1909 to 1940. For some time prior to August 8, 1936, he was precinct inspector. On the date just noted he became chief district inspector and shortly thereafter chief inspector of the metropolitan police. December 1, 1936, he was promoted to assistant deputy superintendent of the police force and served as such until January 15, 1940, when he became the deputy superintendent of police and continued as such until August 7, 1940. In his various positions on the police force appellant, among other duties, was charged with the enforcement of laws pertaining to gambling, vice conditions and liquor conditions.

But appellant points out that according to testimony given by Louis Berg, who as deputy superintendent was the immediate superior of appellant, the policy of enforcement from December, 1936, to January, 1940, was set by commissioner of police Heinrich Pickert and the then superintendent of police, Fred Frahm, and orders with reference to the enforcement of laws relating to gambling were actually given by superintendent Frahm, and not by Heidt. However, Berg also testified: ''The complaints went into the assistant deputy superintendent's (Heidt's) office. I do not know what he did. I can't recall where they went after the middle part of 1938 and early part of 1939.'' And on his direct examination Heidt, in answer to the question as to what were his duties as assistant deputy superintendent, testified that among his duties was that of paying ''special attention to gambling and vice and all liquor licenses.''

It is the people's theory that in so far as Heidt benefited by the alleged conspiracy, he operated through one of the people's witnesses, Raymond W. Boettcher, to whom immunity was granted, and one Elmer Ryan. Boettcher was connected with the police department from 1922 to 1940. At least from November, 1936, he knew both Heidt and Frahm. Boettcher testified he had known Heidt all the time Boettcher had been in the police department. According to Boettcher's testimony in May, 1938, he made an arrangement with one Edward Hall whereunder Hall, who operated a handbook, collected police protection money from a number of handbook operators located in the precinct in which Boettcher was then inspector and elsewhere in Wayne county. The money so collected by Hall and turned over to Boettcher each month varied from $2,400 to $2,600. Of this protection money Boettcher made a monthly contribution of $1,250 to the so-called down-town

pool, but he kept or otherwise disposed of the balance. Boettcher also testified that he had known one Elmer Ryan for 15 years. Elmer Ryan was an active participant in furthering, aiding and abetting the conspiracy charged in this information; and in another prosecution was convicted of a somewhat similar conspiracy to obstruct justice. See *People* v. *Ryan,* 307 Mich. 610. In this record there is testimony that Elmer Ryan received money collected in furtherance of this conspiracy, and that he directed distribution of certain moneys so collected. Further, there is testimony from which the inference might well have been drawn by the jury that after Heidt became assistant deputy superintendent of police and during the period he is claimed to have accepted police protection money, he did not continue to enforce the law against gambling, particularly handbooks, with the zeal and effectiveness which characterized his official conduct in that respect in earlier years when he was a precinct inspector.

The foregoing gives to some extent the background against which the jury was justified in considering Boettcher's testimony, from which we now quote quite at length.

"The defendant Heidt lived on Wiltshire in the years of 1938 and 1939. I have been out to his home with Elmer Ryan. Four or five times, I rode out to Connors and Gratiot and Outer Drive and Gratiot with Elmer Ryan and have seen William Heidt in that vicinity. I got out of the car while he met him around the corner. That is right across from the airport. Ryan met Heidt. As a rule, after I got through giving Frahm and the rest of them the money I used to turn the balance over to Elmer Ryan. (He as a rule called up Mr. Heidt on the telephone, either at my house or at the Wonder Bar.*) Following the conversation from my home

* (Admitted over objection of Heidt's counsel.)

or the Wonder Bar, Elmer Ryan and I would go out to either this location at the airport or out to Heidt's home. When we used to come out there to his home, he (Ryan) used to park the car a door or two from Heidt's house, and he would go in, be in there about 5 minutes, and come out. I remained in the car, out in front.

"On the occasions that I speak of, in the airport, he used to leave me out at Connors and Gratiot or Outer Drive and Gratiot while he drove up the street. He would be gone about 5 or 10 minutes. (He would tell me he was going to Mr. Heidt.*)

"When Elmer Ryan has let me out while he would go up the street, I have seen the defendant, William Heidt, in that vicinity  *  *  *  with his department car, with a brown windbreaker and a light gray cap on. That is while I was waiting for Ryan on one of these occasions. He (Heidt) was going in the same direction that Ryan was or had been. 5 to 10 minutes after I saw the defendant, Heidt, going in that direction, Elmer Ryan came back.

"(Ryan did tell me what he was going to do when he went out to see Heidt. He said he was going to Heidt's house to pay him $1,000.*)

"This started I would say early in 1937. About 20 times Ryan and I either went to Heidt's home or to this — I have seen Heidt come to the door of his home and leave Ryan in. I can't say I have ever seen him let him out.  *  *  *

"Q. Did you ever have a talk with Elmer Ryan or Freddie Frahm with reference to the defendant Heidt going to New York with them to a prize fight?"

Over objection of Heidt's counsel the witness answered:

"In 1936, the latter part of 1936, I rode to the Michigan Central Railroad depot one night with

---

* (Admitted over objection of Heidt's counsel.)

Elmer Ryan to get three railroad tickets for a fight.
* * * And a day or two later he gave me the
money to get the tickets, three tickets, from John
Roxborough, because he lived on Holbrook and John
R, and it would be easier for me to pick up the
tickets then (than) for him, and take them to Frahm
and Bill Heidt."

The trial court overruled the motion by Heidt's
counsel to strike the testimony just above quoted on
the ground that it was hearsay and not an act or
declaration in furtherance of conspiracy. The wit-
ness continued: "It was some popular fight, because
the tickets were around $24 to $26." On cross-
examination by counsel for appellant, Boettcher
testified:

"I went to the vicinity of Mr. Heidt's home, and
Mr. Ryan's. Those trips ran from 1937 up until
August of 1939. * * * I do not know how many
months they occurred in 1938. It would be in the
evening, I would say between 8 and 11 o'clock. All
these trips that I have testified to occurred in the
evening, after dark."

The testimony above quoted was preceded by
other portions of Boettcher's testimony to the effect
that he had collected large amounts of money either
directly or indirectly from various defendants who
operated handbooks, and that under direction of
Elmer Ryan, Boettcher had paid monthly out of
moneys so collected large sums to certain named city
and police officials, some of whom were defendants
in the instant case.

In general the objections of Heidt's counsel here-
inbefore noted were that the testimony was hearsay
and not competent to establish conspiracy. Whether
the objections were well founded must be determined
in the light of the following law.

"Conspiracy may be established by circumstances and may be based on inferences." *People* v. *Roxborough*, 307 Mich. 575, 584, citing *People* v. *Robinson*, 306 Mich. 167, 175.

"Before such acts and declarations (of alleged coconspirators) can be admitted in any event, a prima facie case of conspiracy must appear to the trial court, and then the acts and declarations during the performance of the conspiracy can be submitted to the jury, to be used by them if they find such conspiracy existed, but to be discarded in case it is not established. Such acts and declarations cannot be used to show the conspiracy without other independent evidence. The common design or concert in a common enterprise is the only basis for the admission of such acts and statements. But, like most other facts, it is not required to be established by positive proof. It may be, and, generally is, supported by circumstantial evidence, and it is sufficient if there is evidence tending to establish the fact and from which the jury may fairly infer it." 2 Gillespie, Michigan Criminal Law & Procedure, p. 1295, § 1000; citing Michigan cases.

In *People* v. *Tenerowicz,* 266 Mich. 276, 295, we approve the following instruction given by the trial court:

" 'Before you can find that any defendant is bound by any act or declaration of any other defendant, it is necessary that you find that the defendant to be bound by said act or declaration was a party to such conspiracy with the defendant doing said act or making said declaration in furtherance of the object of said conspiracy.' "

The trial judge in his general charge to the jury covered the phase of the law now under consideration in terms which were fully as favorable to the defendants as they were entitled to have such in-

structions given. And, specifically as to defendant Heidt the trial court charged the jury:

"I charge you with reference to the defendant William Heidt that before you may consider Boettcher's testimony as to what defendant Ryan told him, you must first be satisfied that the conspiracy as to defendant Heidt has been proven by independent evidence, and that he was connected therewith, and participated therein."

And further it may be noted that just shortly preceding the above-quoted portion of the trial court's charge, the circuit judge, evidently having in mind the status of Boettcher as a witness, also charged the jury:

"It is universally accepted that the testimony of one who claims to be an accomplice is liable to grave suspicion and should be acted upon with great caution;  *  *  *  the jury should subject such testimony to careful examination and consider the influence under which the testimony is given and whether the purpose of the witness is to shield himself from punishment, to obtain some benefit for himself or to gratify his malice."

Our review of the phase of the instant case now under consideration convinces us that the testimony of Boettcher to which objections were made was properly received because, aside from the so-called hearsay testimony, there was an abundance of testimony tending to establish facts and circumstances from which the jury might well have and did conclude that appellant was a coconspirator with other defendants, that he knowingly and wilfully conspired with others of the defendants to obstruct justice as charged, and that he actively participated in such conspiracy. We do not overlook the fact that defendant Heidt testified as a witness in his

own behalf and in effect denied all or at least practically all Boettcher's testimony which tends to incriminate Heidt. He denied that he ever saw Elmer Ryan in his (Heidt's) home and also denied that he ever received any money from Ryan. Nor are we unmindful of the portions of the record which seems to disclose that on other occasions while under oath Boettcher testified to some facts and circumstances which are inconsistent with his testimony in the instant case. For example, on cross-examination Boettcher admitted that in the examination of this case he was asked: "Do you know whether or not he (Heidt) was acquainted with Elmer Ryan?" His answer was: "I never saw him in the man's company." However the measure of credibility to be given to Boettcher's testimony or any other testimony submitted in this case was for the jury; and on this record we cannot say that there was not sufficient evidence to justify submitting the issue of appellant's guilt to the jury, that the testimony was not sufficient to "support the trial court's denial of appellant's motion for a directed verdict" or that the verdict of the jury was contrary "to the great weight of the evidence."

We find no prejudicial error in the phase of this record of which this appellant complains and which brought into this case references to another conspiracy to obstruct justice in Wayne county in which Duncan McCrea, Harry Colburn and Sam Block were involved and in which McCrea and Colburn were prosecuted and convicted. Some of the witnesses in the instant case were the same witnesses as those who had testified incident to the other conspiracy; and since certain of defendants in the instant case were defendants in the other conspiracy case which embodied a similar phase of law violation and in that respect was somewhat overlapping, it

was obviously quite impossible to wholly exclude from the instant case testimony relative to facts and circumstances incident to the other conspiracy prosecution. Certainly the testimony of that character in this case was not such as deprived this appellant of a fair trial. And in this connection it may be noted that much of the testimony pertaining to the McCrea conspiracy and of which appellant complains in this respect was given by the people's witnesses, Block and Colburn; but during the whole course of their testimony no objection whatever was made by appellant or his counsel.

Notwithstanding appellant's contention to the contrary, we do not find there was "a fatal material and prejudicial variance between the charge alleged in the information and the evidence adduced" against Heidt. Instead, the testimony introduced which had a bearing upon the issue as to whether or not Heidt was one of the coconspirators was clearly within the charge set forth in the information. It is true that some testimony was received which was relevant to the charge made as against other alleged conspirators, but which did not pertain to Heidt. Nonetheless, it does not lie in the mouth of appellant, as to whom there was proof that he was a party to the conspiracy, to complain merely because testimony was received which was relevant and material to the charge made against other parties to the same conspiracy but did not in any way tend to connect Heidt. This is an unavoidable circumstance which of necessity arises from the fact that, as stated in *United States* v. *Kissel,* 218 U. S. 601 (31 Sup. Ct. 124, 54 L. Ed. 1168), "A conspiracy is a partnership in criminal purposes." There is no such thing as a one-man conspiracy.

In presenting this phase of Heidt's appeal, it is stated in his brief: "The information charges a con-

spiracy to obstruct justice by permitting the operation of handbooks in the County of Wayne. It is the theory of the prosecution that there was one general conspiracy; that the conspiracy was a continuing one; that some of the defendants dropped out, others dropped in, but that its purpose was the same throughout its existence.'' The foregoing is a fairly comprehensive and accurate statement of the charge made in the information and of the people's theory. But we are not in accord with appellant's complaint wherein he states:

''However, the evidence offered by the prosecution does not establish one conspiracy, but, on the contrary, establishes several separate and distinct conspiracies * * * commencing at different times, operating in different localities and composed of separate and distinct conspirators.''

The answer to this complaint is, the record discloses that all of the conspiracies which appellant would label as separate and distinct, even though the acts occurred at different times and in different localities within Wayne county, were germane to the general conspiracy charged as one in which the parties concerned sought to obstruct justice by permitting the operation of handbooks in Wayne county. In *People* v. *Tenerowicz, supra,* 282, we said:

''Further, an indictment alleging conspiracy as to such neglect of duty (to enforce criminal law) will not be rendered bad for duplicity merely because such conspiracy relates to more than one offense. If the misconduct charged is all germane to one course of wrongdoing there is only one conspiracy. It may be charged and punished as a single conspiracy.''

In holding against appellant's contention now under consideration we deem it unnecessary to re-

peat what we have previously said relative to a like contention made under quite similar circumstances in *People* v. *McCrea,* 303 Mich. 213, and *People* v. *Ryckman,* 307 Mich. 631. We merely note that one paragraph of the headnotes in the latter case reads:

"Where testimony shows there was one basic conspiracy and that defendant police officers actively participated in common design and purpose thereof to obstruct justice it was not necessary that they know other coconspirators or have knowledge of their activities or of the scope of the conspiracy; hence claims that the evidence presented by the prosecution showed a multiplicity of conspiracies and constituted an omnibus charge was without merit."

Another ground for reversal asserted by appellant is as follows:

"The constitutional and legal right of a defendant to a full and fair hearing in a criminal trial is denied him where he is forced to go to trial with some 50 other persons and defend himself against testimony which involved not only the 50 other persons on trial, but also testimony which involved some 70 other persons who were not on trial and who offered no testimony in their behalf."

This same contention has been urged under very like circumstances in cases recently appealed to this Court. In those cases the gist of the contention was of the same purport as appellant makes, and which is stated in his brief as follows:

"We maintain that it was impossible for any jury to properly digest this testimony and connect it with the individual defendant concerned, for it could not be expected that a jury could discriminate between evidence which implicated an individual and evidence which was consistent with his innocence."

In the instant case the verdict of the jury conclusively indicates that a discrimination was made between those defendants whose guilt was established and those whose guilt was not established. As above noted, of the 53 defendants as to whom the question of their guilt was submitted to the jury, the verdict as to 26 was not guilty and 27 were found to be guilty. Further, it cannot be said from this record that the jury's verdict of guilty as to appellant Heidt was not sustained by competent proof. In a case presenting very similar conditions, Chief Justice STARR, speaking for the Court, said:

"Their (defendants') objection to the scope of the prosecution and the length of time involved in the trial is without merit. They, together with many others, were charged with a conspiracy to obstruct justice, and the scope of the proofs necessarily included the activities of all persons involved in carrying on the common purpose and design of such conspiracy." *People* v. *Ryckman, supra,* 643.

In *People* v. *Tenerowicz, supra,* 285, it is said: "An indictment may be as general and indefinite as the conspiracy which it seeks to punish." Citing *Bailey* v. *United States* (C.C.A.), 5 Fed. (2d) 437. We are not unmindful that there are numerous cases, some of which are cited in appellant's brief, which criticize the prosecution in one trial of a large number of defendants. However, we are of the opinion that no hard-and-fast rule governing the trial of a plurality of defendants charged with the same offense can be stated. Instead, determination must be made in the individual case upon giving due consideration to the character and scope of the conspiracy charged and to the nature of the alleged participation therein by the respective defendants. In the instant case, as in former cases presenting the same question under like circumstances, we hold

that appellant was not deprived of his constitutional right to a fair and impartial trial.

In presenting appellant's contention on the phase of this appeal just above considered, one of the cases upon which he relies and from which he quotes at length is *Marcante* v. *United States* (C.C.A.), 49 Fed. (2d) 156. In that case a State-wide conspiracy "to manufacture, transport, possess, and sell intoxicating liquors" was charged, and conviction of the defendants was set aside. In substance reversal was planted on the ground that there was no evidence tending to prove that some of the groups involved had any knowledge whatever of a like conspiracy to which other groups included among the defendants and located in different localities were parties. Nor, as the court held, was there any evidence that certain of the defendants "had any part in carrying out (the) purpose of the comprehensive conspiracy charged." Such a determination cannot be made under the record in the instant case. In that particular there is ample ground for distinguishing the two cases. In the *Marcante Case* the court expressly distinguished the holding in *Allen* v. *United States* (C.C.A.), 4 Fed. (2d) 688, wherein a paragraph of the headnotes reads:

"One knowing that others have combined to violate law, who co-operates knowingly to further object of conspiracy, becomes a party thereto, though he is not acquainted with each of the other conspirators, and may know but one of them."

And as applicable to the instant case it may further be noted that in the *Marcante Case* the court said:

"There is no doubt that there can be a conspiracy to violate the liquor laws in a dozen different locali-

ties; such a conspiracy may be a continuing one; actors may drop out, and others drop in; the details of operation may change from time to time; the members need not know each other, or the part played by others; a member need not know all the details of the plan or the operations; he must, however, know the purpose of the conspiracy and agree to become a party to a plan to effectuate that purpose.''

We think the law as above stated fits the instant case wherein the parties who were charged and convicted knowingly cooperated in an effort to operate handbooks in Wayne county free from intervention of law-enforcing officers in consideration of the payment of protection money. Careful consideration of the records and briefs discloses no justification for a conclusion other than affirmance. The conviction and sentence of appellant are affirmed and the case remanded for execution of sentence.

STARR, C. J., and CARR, BUTZEL, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.