PEOPLE *v.* DELANO.
SAME *v.* SHERMAN.

1. CONSPIRACY—COMMON LAW.
   At common law, conspiracy to do an unlawful act was an indictable offense.

2. SAME—COMMON LAW—STATUTES.
   There is no distinction between conspiracy to commit an act unlawful at the common law and one declared unlawful by statute.

3. SAME—CORRUPTION OF LEGISLATURE—BRIBERY.
   Conspiracy to corrupt the State legislature, by means of bribery as charged in information and warrant and proved by evidence, whereby one of the defendants raised money, a lobbyist paid two senators the "cost" of legislative process of a particular bill and paid one of the other defendants, a senator who agreed to use money to influence members of a committee of the house of representatives to release the bill and assure its final passage, was an offense punishable under the laws of the State (Act No. 328, § 505, Pub. Acts 1931).

4. SAME—KNOWLEDGE OF INCEPTION, RAMIFICATIONS OR CONSPIRATORS.
   It is not necessary that each member of a conspiracy to do a criminal act have knowledge of its inception or of all of its ramifications, or know all of the conspirators.

5. CRIMINAL LAW—CREDIBILITY OF ACCOMPLICE—QUESTION FOR JURY.
   The credibility of an accomplice, like that of any other witness, is exclusively a question for the jury.

6. SAME—ACCOMPLICE—CORROBORATION.
   The testimony of an accomplice may be sufficient to permit the jury to convict a defendant on such testimony alone, hence it is not error for court to refuse to charge it was not safe to convict a defendant on the uncorroborated testimony of an accomplice.

7. Same—Conspiracy—Separate Trial—Abuse of Discretion.

It was not error to deny a separate trial to one of ten defendants, charged with conspiracy to corrupt the legislature by means of bribery, where record does not sustain claim of abuse of discretion on part of trial court.

8 Same—Separate Trial—Discretion of Court.

The granting of a separate trial to persons jointly charged with crime is a matter of discretion for the trial court.

9. Same—Prejudicial Remarks—Prosecuting Attorney—Good Faith.

Statements by prosecuting officers in the course of a trial should not be held prejudicial if made in good faith and, when fairly construed, they do not appear to have been such as influenced the jury adversely to the rights of the accused.

10. Same—Prejudicial Remarks—Prosecuting Attorney—Record.

Record in prosecution for conspiracy to corrupt a State legislature by bribery *held*, not to disclose that numerous alleged prejudicial remarks by special prosecuting attorney were such as to influence jury adversely to rights of defendants.

11. Same—Rebuttal Evidence.

Rebuttal evidence is that given by one party to contradict, repel, explain or disprove evidence produced by the other party and tending directly to weaken or impeach the same.

12. Same—Admission in Rebuttal of Evidence Offerable in Chief —Discretion of Court.

Whether or not evidence which could have been offered before resting may be given in rebuttal is a matter within the discretion of the trial court.

13. Same—Admissibility of Rebuttal Evidence.

Rebuttal testimony, limited by the trial court to contradiction of a witness for defendant, was properly received.

14. Same—Cross-Examination on Collateral Matters—Discretion of Court.

The discretion of the trial court upon the subject of cross-examination on collateral matters is not subject to review unless it is shown to have been grossly and oppressively abused.

15. Same—Cross-Examination—Discretion of Court.

So far as the cross-examination of a witness relates either to facts at issue or relevant facts, it is a matter of right, but when its object is to ascertain the accuracy or credibility of a witness, its method and duration are subject to the discre-

tion of the trial judge and, unless abused, its exercise is not the subject of review.

16. SAME—CROSS-EXAMINATION—MATTER UNRELATED TO CHARGE OF CONSPIRACY.

On trial of several defendants charged with conspiracy to corrupt the State legislature by means of bribery, it was not an abuse of discretion on the part of the trial court to instruct jury to disregard testimony on cross-examination of witness which related to a civil matter in no way connected with the conspiracy charge and which antedated alleged conspiracy by upwards of a year.

17. SAME—CONSPIRACY—RES GESTAE.

In prosecution for conspiracy to corrupt the State legislature by bribery, it was not error to admit in evidence on the theory that it was part of the *res gestae* a letter written by one who had died before the trial to another person who was not named in the information as a co-conspirator or as a defendant, where letter contained a number of statements relative to person whose activities were a part of the alleged conspiracy.

18. SAME—CHARACTER.

Character, in the sense in which the term is used in jurisprudence, means the estimate attached to the individual by the community, not the real qualities of the individual as conceived by the witness.

19. SAME—CHARACTER—PERSONAL OPINION—REPUTATION.

A witness called to speak as to character can not give the results of his own personal experience and observation, or express his own opinion but is confined to evidence of general reputation in the community where the defendant resides or does business.

20. SAME—CHARACTER—EVIDENCE—PERSONAL OPINION.

The testimony of two witnesses as to the character of one of two defendants, convicted of conspiracy to corrupt the legislature by bribery, was properly stricken where it appears the witnesses were testifying as to their personal opinion of such defendant.

Appeal from Ingham; Simpson (John), J., presiding. Submitted June 12, 1947. (Docket Nos. 61, 62, Calendar Nos. 43,112, 43,136.) Decided October 13, 1947. Rehearing denied December 3, 1947.

Certiorari denied by Supreme Court of the United States May 17, 1948.

Carl F. DeLano and Mihkel Sherman were convicted of conspiracy to corrupt the legislature. Affirmed.

*Eugene F. Black,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *H. H. Warner* and *Victor C. Anderson,* Assistants Attorney General, and *Richard B. Foster,* Special Assistant Prosecuting Attorney, for the people.

*Blackman & Blackman,* for defendant DeLano.

*Edward H. Kennedy, Jr.,* for defendant Sherman.

SHARPE, J. Defendants, Carl F. DeLano and Mihkel Sherman, were tried, convicted and sentenced under an information which charged them with a criminal conspiracy to corrupt the legislature of the State of Michigan.

The information under which the above named defendants were convicted reads as follows:

"Victor C. Anderson, prosecuting attorney for the county of Ingham, for and in behalf of the people of the State of Michigan, comes into said court in the January term thereof for the year 1945, A.D. and give[s?] the court to understand and be informed:

"That heretofore, to-wit: on the 1st day of January, 1939, and on divers other days and times between that time and the 1st day of July, A.D. 1939 at the city of Lansing, and in the county of Ingham aforesaid, Mihkel Sherman, Max Rosenfeld, Ernest W. Alden, Harry E. McKinney, Clayton R. McKinney, Martin W. Hildebrand, Carl DeLano, Edward J. Walsh, William Buckley and Francis Nowak, did unlawfully and wickedly agree, combine, conspire, confederate and engage to, with and among themselves, and to and with each other, and to and

with certain members of the legislature, and to and with divers other persons to me unknown, wilfully and corruptly to affect and influence the action of the legislature of the State of Michigan, the senate, the house of representatives, and divers members thereof, in the consideration of and action on certain proposed legislative measures then and there pending in and before said legislature, senate and house of representatives, to-wit:

"Senate Bill No. 269, being

" 'A bill to provide for appointment of a board of examiners in naturopathy, and for the examination, regulation, licensing and registration of practitioners of naturopathy, and for the punishment of offenders against this act.'

and divers other measures and bills then and there pending in and before said legislature, the senate and the house of representatives, by then and there offering, tendering, promising, giving and receiving of bribes, money, and other things of value; and by promises to accept and receive such bribes, money, and other things of value; and by the actual giving and receiving of the same, he, the said Carl DeLano, being then and there a duly elected, qualified and acting member of the senate of the State of Michigan; and Edward J. Walsh, William Buckley and Francis Nowak, being then and there duly elected, qualified and acting members of the house of representatives of the State of Michigan; and it being then and there the duty of said members of the said senate and of the house of representatives to refrain from accepting of the promises of bribes, bribes, money, or other things of value, made, offered, or given for the purpose or with the intent of influencing such members in the performance of their official duties and particularly in the consideration of and action on bills and proposed legislation pending before such legislature, senate and house of representatives, and they, the said Mihkel Sherman, Max Rosenfeld, Ernest W. Alden, Harry E.

McKinney, Clayton R. McKinney and Martin W. Hildebrand, being then and there interested in the proposed legislative measures aforesaid, and in other measures then and there pending before said legislature, senate and house of representatives, and it being then and there their duty to refrain from the making of promises, the offering, tendering or giving of bribes, money, or other things of value whatsoever to the members of said senate and house of representatives, or to any one of such members for the purpose and with the intent of influencing said members of the senate or the house of representatives of the State of Michigan, or any of them, in the performance of the official duties of such members, and particularly in the consideration of and action on the proposed legislative measures aforesaid, or any bill or proposed legislation pending in and before said legislature, senate and house of representatives, nevertheless well knowing their respective duties aforesaid, said defendants, and all of them, did corruptly, dishonestly, fraudulently, and illegally engage and participate in said conspiracy and confederate as aforesaid, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the people of the State of Michigan.''

Because of the nature of the charge and the reasons and grounds of appeal, we deem it advisable to give a detailed statement of the history of the case. Sometime during the year 1937 Dr. McDonald of Benton Harbor, Michigan, together with others undertook to rejuvenate the American Naturopathic Association of Michigan, hereafter referred to as A.N.A. It was deemed advisable to interest chiropractors, in the association. Harry Williams was employed as an organizer to go about the State of Michigan and procure members for the A.N.A. On May 22, 1938, a meeting was held in the city of Bat-

tle Creek, at which time a board of directors was elected. Mihkel Sherman and Martin W. Hildebrand were elected members of the board of directors. Sherman was elected president and Hildebrand was made chairman of the finance committee. At this meeting, the bylaws were amended to bring their corporate structure up to date and thereafter meetings were held in June and October of 1938 for the purpose of carrying out the intentions of the persons interested in the subject of naturopathy. Sometime prior to December, 1937, the members of the A.N.A. decided to employ the services of a lawyer to draft a bill for the legislature legalizing the practice of naturopathy. A committee was selected to formulate such a bill and submit it at the session of the legislature in 1939.

It also appears that sometime during the month of December, 1938, arrangements were made with Senator Baldwin to introduce the proposed naturopathic bill and about this time Harry R. Williams, as organizer and secretary of the A.N.A., came to Lansing, obtained a room in a local hotel and proceeded to carry on his activities as a lobbyist for the A.N.A. During the month of January, 1939, Williams learned that Senator Baldwin would not introduce the bill. Whereupon, arrangements were made with Senator Burhans to introduce the bill, but he became ill and was unable to take care of it. On or about the middle of March, 1939, Williams went to see Senator Howell and was advised by Senator Howell that he would not introduce any bills at that session, but would find some one to introduce the bill. It also appears that a short time later Senator Howell brought Senator Shea to Williams and arrangements were made with Senator Shea to introduce the bill. Senator Shea was paid the sum of $500 by Williams for his services in in-

troducing the bill and Senator Howell was paid three or four hundred dollars.

The bill was introduced in the senate March 28, 1939, and referred to the senate public health committee. On April 30, 1939, an "emergent meeting" of the A.N.A. was called in the city of Detroit for the purpose of raising funds with which to take care of certain lobbying expenses and the raising of money to pay legislators. Upwards of 70 people attended this meeting and several hundred dollars were raised and later forwarded to Williams. The bill was reported out of the public health committee on May 3d. It was voted upon and passed by the senate on May 9, 1939, and transmitted to the house of representatives where it was referred to the committee on State affairs. Shortly after the bill had been referred to the above committee, Williams became convinced that some pressure would have to be exerted if the bill was to receive favorable consideration by the committee. Sometime prior to May 14, 1939, Williams had a talk with defendant DeLano, the purpose of which was to secure the influence of defendant DeLano in getting favorable action upon the bill. It appears that DeLano demanded $2,500 to use his influence in getting the bill out of the house State affairs committee.

Shortly after Williams' talk with DeLano, another meeting of members of the A.N.A. was called in Lansing. There were about 100 present at this meeting. The meeting was presided over by defendant Sherman who informed those present that it was necessary to raise a substantial sum of money to get the bill through the legislature. Approximately $2,000 was raised at this meeting. The money was turned over to the treasurer of the association who gave Williams a check for $1,950 which Williams deposited in his bank account at Benton Harbor. About May 20th, Williams drew

out the proceeds of the check, came to Lansing and paid DeLano $2,000 and DeLano returned to Williams the sum of $100. Sometime later and upon receipt of a telephone call, Williams went to Kalamazoo to the farm home of DeLano at which time DeLano informed Williams that he, Williams, owed him some money.

The cause came on for trial and at the conclusion of the people's proofs, counsel for DeLano and Sherman moved for a directed verdict upon the following grounds:

"First, that the information does not charge an indictable offense at common law.

"Second, that the information does not charge any offense.

"Third, that the evidence does not show that the defendant Carl DeLano committed any offense not cognizable by a justice of the peace.

"Fourth, that the evidence does not show that the defendant Carl DeLano committed any offense.

"Fifth, that the information alleges a concert of action betwen alleged givers of bribes, and alleged takers of bribes, and that conspiracy will not lie where concert of action is necessary to an offense.

"That there may not be a conspiracy founded upon a charge to commit bribery between persons, one charged with the intended taking and several charged with the giving of the same bribe.

"Sixth, that where the concerted action of the giver and the taker is essential to constitute the crime of bribery, and indictment or information will not lie for conspiracy to commit bribery, if the conspiracy is charged to have included both the prospective giver and the prospective receiver, although several persons are involved as prospective givers, in the alleged conspiracy."

At the conclusion of all proofs the above motion was renewed and again denied. The cause was submitted to a jury who returned a verdict of guilty

against defendants DeLano and Sherman. Subsequently, motions for a new trial were made by both defendants and denied.

Upon leave being granted, both defendants herein appeal. Defendant DeLano urges that prejudicial error was committed by the trial court in the following particulars: That the court was in error in denying the motion of defendant DeLano to quash the warrant and information for the reason that there is no proof that DeLano entered into a conspiracy to bribe the legislature; that at most he did no more than agree to act as a lobbyist; and that bribery can not be the subject or basis of a charge of conspiracy for the reason that it requires a plurality of agents and concert of action of two or more persons.

The principal question in this cause is whether a conspiracy to corrupt the legislature, as charged in the warrant and information, is an offense punishable under the laws of Michigan.

The charge of conspiracy is based upon section 505 of our penal code (Act No. 328, Pub. Acts 1931 [Comp. Laws Supp. 1940, § 17115–505, Stat. Ann. § 28.773]), which provides:

"Any person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this State, shall be guilty of a felony."

In *People* v. *Beath,* 277 Mich. 473, defendants were charged with a conspiracy to cheat and defraud and obtain money by false pretenses. It was claimed that defendants were found guilty of offenses unknown to the common law or to the statutes of the State. We there said:

"At common law, conspiracy to do an unlawful act was an indictable offense. There is no distinc-

tion between conspiracy to commit an act unlawful at the common law and one declared unlawful by statute."

In the case at bar, the common-law conspiracy charged in the people's information was broad in scope and required a number of participants. There is evidence that a group of people organized to promote a bill to legalize the practice of a profession of which they were members; they hired Williams as a lobbyist who arranged for the introduction of the bill in the senate by paying two senators the "cost" of such legislative process; that the group held frequent meetings, the main purpose of which was the raising of money to be expended by Williams in influencing such legislation; that defendant Sherman was active in the raising of funds for such purpose; that defendant DeLano was paid $2,000 and agreed to use such sum to influence members of the committee of the house of representatives to release the bill and thus assure its final passage.

The record contains competent evidence to sustain the charge that a conspiracy was formed for the purpose of corrupting the legislature by means of bribery. It was not necessary that DeLano and Sherman have knowledge of its inception or of all of its ramifications. See *People* v. *Garska*, 303 Mich. 313; *People* v. *Ryan*, 307 Mich. 610; *People* v. *Ryckman*, 307 Mich. 631. Nor was it necessary that they know all of the conspirators. See *People* v. *Heidt*, 312 Mich. 629. We conclude that the conspiracy to corrupt the legislature as charged in the warrant and information is an offense punishable under the laws of Michigan.

We note that the only testimony given as to the participation of DeLano in the conspiracy is that of the people's witness Williams.

In *People* v. *Zesk*, 309 Mich. 129, we said:.

"The correct rule is well stated in 1 Gillespie on Michigan Criminal Law & Procedure, § 379:

" 'The credibility of an accomplice, like that of any other witness, is exclusively a question for the jury, and it is well settled that a jury may convict on such testimony alone, and it is not error for the court to refuse to charge that it is not safe to convict a defendant, on the uncorroborated testimony of an accomplice.' "

See, also, *People v. Clark*, 312 Mich. 665.

The credibility of the witness Williams was exclusively a question for the jury. There is evidence that DeLano and Sherman joined in the conspiracy to corrupt the legislature.

Defendant DeLano also urges that it was an abuse of discretion to deny his motion for a separate trial. The reason given in support of this motion is that his dealings with Williams were separate and apart from the conspiracy. Our holding is contrary to such reasoning. Moreover, the granting of a separate trial is a matter of discretion for the trial judge. See *People v. O'Hara*, 278 Mich. 281; *People v. Garska, supra; People v. Burczyk*, 308 Mich. 194. The record does not sustain the claim that there was an abuse of discretion.

It is urged by defendants DeLano and Sherman that the remarks and conduct of the special prosecuting attorney throughout the course of the trial were prejudicial and that the convictions should be set aside. Counsel for defendant DeLano lists 112 assignments of error relating to the prejudicial and derogatory remarks of the special prosecuting attorney. Space will not permit us to enumerate these remarks in detail. In many instances these statements were made without being followed by objections by defense counsel, while in other instances when rulings were requested, such rulings were given and the jury instructed upon the same.

In *People* v. *Burnstein,* 261 Mich. 534, 538, we said:

"Great care should be taken by prosecuting officers and trial courts thát no statement be made in the presence of jurors which would jeopardize a defendant's right to a fair trial. But in the haste and heat of a trial it is humanly impossible to obtain absolute perfection, and of necessity some allowance must be made in determining whether impromptu remarks are to be held prejudicial. Statements should not be held prejudicial if they are made in good faith, and, when fairly construed, they do not appear to have been such as influenced the jury adversely to the rights of the accused."

We have examined the record carefully and note that the case was hotly contested, but we are not convinced that the remarks complained of influenced the jury adversely to the rights of the defendants.

Defendants urge that it was prejudicial error to admit the testimony of Clayton McKinney, as one of the people's rebuttal witnesses, as such testimony consisted of matters which had been fully gone into by the people in its main case. It appears that the witness together with his brother operated a sanitarium at Centerville, Michigan, and had pleaded guilty to the information. Prior to the witness being placed on the stand, Mr. Kennedy, attorney for defendant E. W. Alden, objected to the witness giving any testimony. The trial court expressed the opinion that he could "see where there would be certain rebuttal as to the meeting in the hotel;" that, "it was called to Mr. Alden's attention, and which he denied, as to the $20,000." The trial court also ruled, "I think certain parts there are proper for rebuttal, and I will allow him to go ahead and if there is anything you feel he is not entitled to you may object, and I will consider the matter at that time."

The witness was allowed to testify and testified that he had become a member of the A.N.A.; that he attended a meeting at the Olds Hotel on May 14, 1939; that Harry Williams and Dr. Alden presided over the meeting; that defendant Sherman was present; that they were there for the purpose of raising funds; and that Dr. Alden made a statement that it was necessary to raise money to get this naturopathic bill through the legislature. He identified a check for $1,000 payable to the A.N.A., issued by himself and brother for the purpose of matching dollars. It also appears that counsel for defendant DeLano failed to object to the procedure until McKinney's testimony had been given. The trial court ruled that McKinney's testimony might stand as to what Dr. Alden said on the occasion of the meeting "because it was called to his attention" and the record showed he denied it.

In *People* v. *Utter*, 217 Mich. 74, 83, we said:

"Rebuttal evidence is broadly defined as that given by one party to contradict, repel, explain or disprove evidence produced by the other party and tending directly to weaken or impeach the same. In practical application the line of demarcation between rebuttal evidence and that which should properly be given in chief before the prosecution rests is frequently more or less obscure, and it is a general rule that whether evidence which could have been offered before resting may be given in rebuttal is a matter within the discretion of the trial court."

Under the circumstances of this case the rebuttal testimony given by McKinney, as limited by the trial court, was proper.

It is also urged by defendants that the court was in error in striking from the record and directing the jury to disregard testimony of Williams upon cross-examination relating to checks drawn by Wil-

liams on July 13, 1937, in favor of M. H. Martin
for $180 and another check drawn by Williams on
July 31, 1937, in favor of M. H. Martin for $180.23,
the said Williams having admitted that he had no
account in the bank upon which the checks were
drawn at the time of drawing. It appears that in
1937 Williams made an application for life in-
surance, to Martin, an agent of a life insurance
company; that the checks were protested for non-
payment as Williams had no account in the bank at
that time; that later Williams had made payments
on these two checks until there was on May 15, 1939,
a balance of $65.44. No criminal warrant was is-
sued as a result of this transaction.

The trial court ruled:

"There was no criminal charge made against it.
It is a civil situation and it is entirely within the
discretion of the court and the court ruled against
you, something that happened in '37 (1937)."

In *People* v. *Pinkerton,* 79 Mich. 110, 114, we said:

"In a criminal case, we do not think it competent
to compel respondent, who is a witness, to answer
questions irrelevant to the issue, having a tendency
to bring in other charges. Whatever, latitude is
proper in cross-examination to test veracity, it can
not properly introduce independent issues against
the person who is both witness and respondent."

In *People* v. *McArron,* 121 Mich. 1, 36, we said:

"'The latitude allowed in cross-examination should
not ordinarily go so far as to permit the introduc-
tion of evidence which has no legitimate relation to
any of the issues on trial, and which is at the same
time of such a character as to be likely to be applied
to them by the jury, and improperly to affect the
verdict."

In *People* v. *MacCullough*, 281 Mich. 15, we said:

"The discretion of the trial court upon the subject of cross-examination on collateral matters is not subject to review unless it is shown to have been grossly and oppressively abused. So far as the cross-examination of a witness relates either to facts at issue or relevant facts, it is a matter of right; but when its object is to ascertain the accuracy or credibility of a witness, its method and duration are subject to the discretion of the trial judge and, unless abused, its exercise is not the subject of review."

The issue between Williams and Martin was a civil matter and was in no way connected with the conspiracy charge. There was no abuse of discretion upon the part of the trial court in instructing the jury to disregard this testimony.

It is also urged that it was error to admit in evidence a letter written by Dr. Fred Wright to E. E. McMullen. Dr. Wright died approximately two years before the information was filed and E. E. McMullen was not named in the information as a co-conspirator or as a defendant. The letter reads as follows:

"AMERICAN NATUROPATHIC ASSOCIATION OF
MICHIGAN
(Inc., Not for Profit)
General Office: 7308 Hamilton Avenue
Detroit, Michigan.

Flint, Michigan
April 26th, 1939.
12.10 midnight.

"DR. ELMER E. McMULLEN, D. C.
Fremont, Michigan.

"*My Dear Dr. Mac:*—

"I received your letter yesterday, and I can't tell you how I appreciate the sentiment and regards

that you have expressed to me. I have seen much of the world and I have learned by bitter experience that to deal with your fellow man honestly is the best policy to pursue.

"All any man has in this world Mac. is the reputation he bears of dealing honestly with his fellow man, both Mrs. W. and I appreciate very much the sentiment you expressed in your letter, we both thank you very much and may the day never come when you will be sorry for the confidence you have placed in me.

### "Now Here is the Latest News

"You will remember that Dr. Faulkner and I underwrote for the board the obligation of Dr. Williams in Lansing to the extent of $200 to cover certain conditions which you and I understand, this check was dated ahead, payable on the 27th of April, and was to be paid to certain people ONLY WHEN THE BILL WAS REPORTED OUT OF COMMITTEE, you will remember this was the instructions of the board to Dr. Williams, now listen Dr. Mac.— on Tuesday, the 25th, at 6.10 p.m. Harry came to my office, said he had showed the check to certain men interested, and that they said 'We don't do business that way, if your money is laid on the board this a.m. as you were told your bill would have been reported out as we said,' So Harry said 'I have brought the check back to you Fred knowing you had a hundred bucks on it.' He wanted me to cash it so he could go back to Lansing and close the deal. I said 'not on your life Harry, the instructions of the board was to pay this money *when the bill* was reported out and not before, if I done this knowing the check was advance dated I would be breaking faith both with Dr. Paul and the board—the check would be protested and I would be left holding the bag for $200.

"Harry then said he was checking out of the whole damned business, would get his books in Lan-

sing, take them to McDonald that night and quit the game that he was unable to take care of his family and was broke and sick of the whole business, that if some of these wise guyes who thought they could do a better job than he had, they now had the chance to try it out, that they wouldn't get very far if they tried.

"With this thought expressed to me he pulled out for Benton Harbor, he gave me *permission to quote him as above.* I got Dr. Paul on the phone, told him about the check, that I would send it to him in the. a.m. and for him to send me his check for the $100 this he said he would do, *now here is the funny thing about it*—Harry goes thru to Benton Harbor as his intentden and Dr. McDonald talked him into sticking to the game some way, as he sent me this wire this morning—

---

" '1939—April 26th, 2:00 p.m.
"269 absolutely coming out must take care of it wire it to me please don't fail me. Harry.'

---

"I called him at Lansing on the phone, he said McD. had talked him into sticking, that Dr. Paul had wired him $100 and asked me to do the same, I called Dr. Paul and found out it was all right, that he—Paul had sent the money, I went to the Postal Tel. and sent the $100, so now there shouldent be any more holdup so far as the Senate is concerned.

"Now you know just how the land lays up to the present hour, but Mac., somehow I seem to feel that there is a Nigger in the woodpile somewheres, but I cant just put my finger on him at the present time, what do you think about it? how the House will be taken care of I dont know, but one thing is certain— I am not putting another damed cent in this deal until some of these Dudes have pain in their Dues and cleaned up their Memberships. You will find many mistakes in this letter but Mac. I am dog

goned tired but thought you would like to know what was in the wind.·

"With kind regards to the wife and family from Mrs. Wright and my self, I will say Good Morning.
"Dr. FRED."

When the above letter was offered in evidence, Mr. Kennedy, counsel for defendant Alden, objected to its admission for the reason that it was hearsay testimony and a communication from a man now dead and who was not named as a co-conspirator. Counsel for defendant Sherman made the same objection. The trial court admitted the letter on the theory that it was part of the *res gestae.*

In *People* v. *Wilcox,* 303 Mich. 287, one Gell made collections from various illegal businesses in the city of Hamtramck and made payment to the prosecutor's office and the sheriff's office. At the trial of the above case Gell was deceased, but had been named as co-conspirator and a defendant. One Block had been named in the information as a co-conspirator but not as a defendant. Objections were made to the testimony given by Block to the effect that he, Block, paid Gell monthly sums for the sheriff's office so that Block could operate a handbook in Hamtramck. We there said: "The relations with Elik Gell were part of the *res gestae* and everything that Gell did was in furtherance of the conspiracy."

It should be noted that when the letter was offered in evidence counsel for DeLano offered no objections to its admission and later made use of the letter in his cross-examination of Williams. While the letter does not mention either of the defendants DeLano or Sherman, yet we think the action taken by Dr. Wright as evidenced by the letter written by him was a part of the conspiracy and as such was admissible in evidence.

It is also urged that the court was in error in striking out the testimony of character witnesses for defendant Sherman. It appears that the witness Hubbard lived in Detroit since 1902, had been Sherman's patient for approximately 20 years. He considered Sherman's general reputation for honesty and integrity in the community as very good. He never talked with anyone about Sherman. He knew that Sherman lived in Farmington, but had never been to his home. On examination the following questions were asked and answers given:

"*Q.* With whom did you ever talk about Dr. Sherman?

"*A.* I don't know as I ever talked with anybody about him.

"*Q.* So that the opinion you have given us here is your own personal opinion?

"*A.* Yes, sir, absolutely."

A. J. Cetnar, a character witness produced in behalf of Dr. Sherman, testified that he had known Dr. Sherman since 1939; that he knew defendant's reputation in the community in which he resided for honesty and integrity and that it was very good. However, upon cross-examination the following questions were asked and answers given:

"*The Court:* Did you ever talk with anyone in the community in which he resides about his reputation?

"*A.* No, I haven't.

"*The Court:* Do you know where he lives?

"*A.* Well, I don't know off hand.

"*The Court:* You never talked with anyone in that community about his general reputation?

"*A.* No, I don't Your Honor, I am not close enough here.

"*The Court:* What you are giving here is your personal appraisal of the man?

"*A.* That right."

The record shows that the witnesses were testifying as to their personal opinion of Dr. Sherman.

In *People* v. *Nemer,* 218 Mich. 163, we quoted with approval from 1 Wharton's Criminal Evidence (10th Ed.), § 58, as follows:

"Character, in the sense in which the term is used in jurisprudence, means the estimate attached to the individual by the community, not the real qualities of the individual, as conceived by the witness. It is not what the individual really is, but what he is reputed to be, generally, by the society and the community in which he moves and resides. So, a witness called to speak as to character can not give the results of his own personal experience and observation, or express his own opinion, but he is confined to evidence of general reputation in the community where the defendant resides or does business. Such a witness, so confined to general reputation, may be examined for the purpose of testing his opportunities of ascertaining that reputation."

In *People* v. *Albers,* 137 Mich. 678, we held that the opinion of witnesses as to accused's character for honesty and integrity, based on personal knowledge and not on reputation, is inadmissible. In view of the authorities above quoted, the ruling of the trial court in instructing the jury to disregard the testimony of the two witnesses was correct.

Other questions have been raised, but in view of the fact that decision on these questions does not affect the result of our decision, we forego discussion of such questions.

The judgment of conviction in each case is affirmed.

BUTZEL, BUSHNELL, BOYLES, REID, NORTH, and DETHMERS, JJ., concurred. CARR, C. J., did not sit.