PEOPLE *v* HOLLIS JACKSON

1. CRIMINAL LAW—EVIDENCE—SUFFICIENCY—ACCOMPLICE'S UNCORROBORATED TESTIMONY.

A defendant can be convicted by the uncorroborated testimony of an accomplice.

2. HOMICIDE—FIRST-DEGREE MURDER—EVIDENCE—ACCOMPLICE'S UNCORROBORATED TESTIMONY—SUFFICIENCY.

Defendant's first-degree murder conviction was supported by sufficient evidence where an accomplice gave uncorroborated testimony that the defendant shot the decedent during an attempted robbery by four participants even though the defendant and the two other participants contradicted that testimony and even though those two other participants were

REFERENCES FOR POINTS IN HEADNOTES
[1, 2]  21 Am Jur 2d, Criminal Law § 118.
   30 Am Jur 2d, Evidence § 1151.

acquitted on the same evidence, because the uncorroborated testimony of an accomplice is sufficient to support a conviction and the conflict in evidence created a question of credibility for the trier of fact (MCLA 750.316).

Appeal from Recorder's Court of Detroit, Robert L. Evans, J. Submitted Division 1 November 8, 1971, at Detroit. (Docket No. 10090.) Decided January 18, 1972.

Hollis Jackson was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Luvenia D. Dockett,* Assistant Prosecuting Attorney, for the people.

*Thomas J. Olejnik,* for defendant on appeal.

Before: LESINSKI, C. J., and HOLBROOK and VAN VALKENBURG,* JJ.

HOLBROOK, J. Defendant Hollis Jackson appeals from nonjury conviction of murder in the first degree, in violation of MCLA 750.316; MSA 28.548.

Jackson was jointly tried with defendants William Draughn and Melvin Dixion for the murder of John Buch, perpetrated during the course of an attempted robbery of the decedent.

The victim was shot and killed March 29, 1969, at 301 South Green Street in the City of Detroit, as he exited his bar after closing for the night. An autopsy performed on the decedent disclosed that he

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

was shot three times, with the cause of death being a single gunshot wound in the chest.

The prosecution conceded that the only evidence available to prove guilt was the testimony of an accomplice participant, Danny Holmes, who was in jail waiting trial on another charge when he implicated himself and the other defendants in the Green Street incident. Holmes was not charged as a defendant in this murder.

At the trial Holmes testified that Jackson shot the decedent twice with Draughn firing other shots. Holmes testified that the total number of shots fired at decedent was seven or eight. Holmes further maintained that neither he nor Dixion had fired any shots. Codefendants Dixion and Draughn were found not guilty.

Defendant Jackson raises two issues on this appeal.

(1) Whether there was sufficient evidence upon which the trier of facts could determine Hollis Jackson guilty of the offense charged beyond a reasonable doubt?

Holmes' testimony on direct examination concerning Jackson's participation in the murder is set out herein.

"*Q*. Do you know the three defendants in this case, Hollis Jackson, Melvin Dixion, and William Draughn?

"*A*. Yes I do.

"*Q*. On March 29, 1969, how long had you known them?

"*A*. About two and a half months.

"*Q*. Beg your pardon?

"*A*. About two and a half months.

"*Q*. How did you get to know them?

"*A*. Through my brother.

*"Q.* Now, do you remember the night of March 29, 1969, on a Saturday night; do you remember the events of that night?

*"A.* Yes I do.

*"Q.* Were you anywhere near a bar located at 301 South Green Street, in the City of Detroit?

*"A.* Yes I was.

*"Q.* Around what time was it?

*"A.* About 11:45.

*"Q.* When you were there, were any other individuals there with you?

*"A.* Yes it was.

*"Q.* Who were with you?

*"A.* William Jerome, Melvin Dixion, and Hollis Jackson.

*"Q.* If you see them in the courtroom, will you point them out?

*"A.* Yes sir, right there *(indicating)*.

*"Mr. Weiswasser* [*assistant prosecuting attorney*]: Let the record show the witness has identified the defendants William Draughn, Hollis Jackson, and Melvin Dixion.

*"The Court:* Which is—

*"Q. (By Mr. Weiswasser)*: Which is which?

*"A.* William Jerome, Hollis Jackson, and Melvin Dixion.

*"Q.* What were you doing in the neighborhood at that bar at 11:45 that night?

*"A.* Planning on robbing it.

*"Q.* And, did you know that there was going to be a robbery—that a robbery was to take place at that bar?

*"A.* Yes I did.

*"Q.* And, did you have a conversation with the three defendants about going to that place to rob the bar?

*"A.* Yes we did.

\*    \*    \*

"*Q.* (*By Mr. Weiswasser*): Where did you have this conversation about robbing this bar?

"*A.* In the car.

"*Q.* How long before the robbery took place?

"*A.* About two hours.

"*Q.* And, who was in the car besides yourself?

"*A.* Melvin Dixion, Hollis Jackson, and William Draughn.

"*Q.* Who was driving?

"*A.* Dixion.

"*Q.* Do you know whose car it was?

"*A.* Melvin Dixion.

"*Q.* Well, did they—did you decide whether or not between all four of you whether or not you were going to rob the bar inside the bar or outside the bar?

"*A.* We decided to rob it outside.

"*Q.* Do you know why?

"*A.* Well, because of, well—really the front door was locked, and we decided on, well, doing it outside from the beginning, but we were just trying our luck for the inside.

"*Q.* All right. When you got to the bar, where did you put the car?

"*A.* It was parked in the alley on Green Place.

"*Q.* And, did all of you get out of the car?

"*A.* All three of us but Melvin Dixion.

\* \* \*

"*Q.* Did he know there was going to be a holdup there?

"*A.* Yes he did.

"*Q.* All right, now did you see anybody come out of the bar around that time?

"*A.* Well, the man stuck his head out and looked up and down the street and locked the front door, and that's when we ran around to the back.

"*Q.* And then what happened after you got around to the back?

"*A*. Well, about twenty minutes later he came out and well, Hollis Jackson said this is a holdup, and he put his hands up in the sky. And they told me to search him, but I didn't so William Jerome started sticking his hands in his pocket. About ten minutes later Jerome said look out; that's when the shooting started.

"*Q*. You said Hollis Jackson said this was a stick-up?

"*A*. Right.

"*Q*. What did William Draughn do?

"*A*. He started searching him.

"*Q*. And you say you were asked to search him and you wouldn't do it?

"*A*. No.

"*Q*. Why?

"*A*. Well, because—I mean, really I didn't want no part of it, but I had went so far, so I decided to go home.

"*Q*. Did you see Draughn put his hands in the man's pockets?

"*A*. Yes I did.

"*Q*. Then what happened?

"*A*. Then all of a sudden he took his hands out of his pockets and said look out; that's when the shooting started.

"*Q*. Who said look out?

"*A*. Jerome.

"*Q*. Did he say anything else besides look out?

"*A*. No he didn't.

"*Q*. Who did the shooting?

"*A*. Hollis Jackson.

"*Q*. Did you see Hollis Jackson shoot the man?

"*A*. Yes I did.

"*Q*. How many times did he shoot him?

"*A*. Twice.

"*Q*. And, what did you do when you heard the shot?

"*A*. I started running towards the car.

*"Q.* What did Draughn do?

*"A.* He started running towards the car and firing shots as he ran." (The name William Jerome in the testimony is another name for defendant William Draughn.)

Although no bullet was recovered from the victim's body, Sergeant Robert Kanka testified that when he interviewed Holmes, Holmes stated the gun used by Jackson was a .38-caliber automatic pistol. Kanka further testified that spent cartridges from a .38-caliber automatic weapon were found at the scene of the murder.

We can readily see that through testimony of Holmes, evidence was presented permitting the trial judge to determine that Jackson shot the victim. Even though Holmes was an accomplice participant, and his testimony was the sole predicate for conviction of defendant, the Supreme Court of Michigan and our Court have held that a defendant can be convicted by the uncorroborated testimony of an accomplice. *People* v *Zesk,* 309 Mich 129 (1944); *People* v *DeLano,* 318 Mich 557 (1947); *People* v *Billings,* 19 Mich App 348 (1969); *People* v *Burbridge,* 23 Mich App 33 (1970).

All three defendants testified contrary to the testimony of Holmes, thus presenting a dispute as to the facts throughout the entire proceeding. We find it difficult to understand how the trial judge reached his decision of acquitting codefendants Dixion and Draughn, but finding defendant Jackson guilty, on the same evidence. However, credibility and the weight to be given the testimony is for the trier of the facts, and here apparently the trial judge believed the testimony of accomplice Holmes and rejected that of defendant Hollis Jackson. *People* v *Doris White,* 2 Mich App 104 (1965); *People* v *Ritzema,* 3 Mich App 637 (1966). We determine

that there was sufficient evidence present which, if believed, justified the finding of defendant guilty beyond a reasonable doubt.

(2) Defendant now claims that it was error to stipulate to the reading of the preliminary examination by the trial judge. The reading was requested by defense counsel for defendant Draughn because of claimed inconsistencies in the testimony of witness Holmes at the preliminary examination and at the time of trial. Defendant's attorney, when asked if he objected, answered no. There being no objection to this procedure, error, if any, has not been preserved.

Affirmed.

All concurred.