# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ALEXANDER ISAIAH ANSARI,

Defendant-Appellant.

UNPUBLISHED
February 12, 2015

No. 318524
Wayne Circuit Court
LC No. 12-010941-FC

Before: FORT HOOD P.J., and JANSEN and GADOLA, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree murder, MCL 750.316, two counts of assault with intent to commit murder, MCL 750.83, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to life imprisonment without parole for his first-degree murder conviction, 20 to 50 years' imprisonment for both assault with intent to commit murder convictions, and two years' imprisonment for his felony-firearm conviction. We affirm, but remand for the ministerial task of amending the judgment of sentence.

## I. BACKGROUND

On September 22, 2012, Rosalind Barley and Ileana Cuevas drove to 4238 Cicotte Street in Detroit, Michigan, the residence of Miguel Figeroa. Barley testified that immediately after Figeroa entered the backseat of the vehicle, she heard a series of loud noises that sounded like fireworks. Barley explained that she did not immediately realize the noises were gunshots hitting her vehicle; however, after looking out the passenger window, she saw defendant across the street holding a long gun. Figeroa testified that he observed defendant fire the weapon toward the vehicle.

After hearing the shots, Figeroa quickly exited the vehicle and Barley drove away from the scene. Barley testified that as she was driving away, she looked at Cuevas and noticed Cuevas's arm was stiff and her lips were white. Barley drove to the parking lot of a nearby restaurant where she realized she had been shot in the right shoulder. Cuevas died as the result of a gunshot wound to the chest.

Meanwhile, upon exiting the vehicle, Figeroa began running from the scene. While he was running, Figeroa was shot in the back and the leg. Figeroa testified that after being shot, he

-1-

turned around in order "to get a good look at [the shooter] again," and was then shot in the face. Figeroa explained that he called his sister on his phone and continued running, but collapsed when he reached the next block. His sister soon arrived and drove him to the hospital. The police later arrived to investigate the incident, but the shooter was not apprehended at the scene.

On September 27, 2012, Barley was shown a photographic array, which did not include a photograph of defendant. Barley was unable to identify the shooter among the photographed individuals. On October 2, 2012, Figeroa was shown a different photographic array, which also did not include a photograph of defendant. Figeroa was unable to identify the shooter among the photographed individuals. Thereafter, Detroit Police Officer Moises Jimenez had Figeroa work with a sketch artist to produce a drawing of the shooter. Jimenez testified that he obtained defendant's name as a suspect in the shooting, and after comparing defendant's photograph with the drawing, he decided to create another photographic array for Figeroa and Barley to review.

On October 11, 2012, Figeroa was shown a photographic array that included the defendant, and Figeroa identified him as the shooter. On October 12, 2012, Barley was shown the same photographs, but was unable to identify the shooter. On November 19, 2012, the police held a live lineup in which all participants wore orange caps to cover their hair. Barley and Figeroa both identified defendant as the shooter at the live lineup. On January 3, 2013, defendant filed a motion to suppress his identification, arguing that the photographic arrays were unduly suggestive and tainted the live lineup identifications by Figeroa and Barley. On May 1, 2013, the court denied defendant's motion.

At trial, both Figeroa and Barley identified defendant in court as the shooter. In response, defendant introduced the testimony of Leola Marlowe. Marlowe testified that on September 22, 2012, she heard gunshots while she was in her home near Cicotte Street. Marlowe stated that she saw a man with a gun run down the alley from Cicotte Street, place the gun in the trunk of a car, and drive away. Marlowe testified that she knew defendant from the neighborhood and he was not the person she saw running from the scene. Over defendant's objection, the court allowed the prosecution to call Jimenez as a rebuttal witness. Jimenez testified that when he interviewed Marlowe immediately after the shooting she was nervous, shaky, and scared. The jury found defendant guilty of all crimes charged.

## II. UNDULY SUGGESTIVE LINEUP

Defendant first argues that the trial court clearly erred and violated his due process rights by refusing to suppress the identification evidence obtained from allegedly unduly suggestive pretrial identification procedures. We disagree.

In general, we will not reverse a trial court's decision to admit identification evidence unless it is clearly erroneous. *People v McDade*, 301 Mich App 343, 356; 836 NW2d 266 (2013). We review a trial court's findings of fact with regard to a motion to suppress for clear error. *People v Murphy (On Remand)*, 282 Mich App 571, 584; 766 NW2d 303 (2009). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *McDade*, 301 Mich App at 356. We review issues of constitutional law de novo. *People v Hickman*, 470 Mich 602, 605; 684 NW2d 267 (2004).

"In order to sustain a due process challenge, a defendant must show that the pretrial identification procedure was so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification." *People v Kurylczyk*, 443 Mich 289, 302; 505 NW2d 528 (1993). Generally, a photographic array is not unduly suggestive if "it contains some photographs that are fairly representative of the defendant's physical features." *Id.* at 304. Differences in the physical characteristics or clothing of a defendant and other persons pictured in a photographic array do not necessarily render a lineup impermissibly suggestive. *Id.* at 304-305. Rather, "[p]hysical differences . . . are significant only to the extent that they are apparent to the witness and substantially distinguish the defendant from the other lineup participants." *People v Hornsby*, 251 Mich App 462, 466; 650 NW2d 700 (2002).[1]

A witness's identification of a defendant may be deemed improper if differences in the photographs used in a photographic array "led to a substantial likelihood of misidentification." *Kurylczyk*, 443 Mich at 305. Generally, reviewing courts will find impropriety if a witness identifies a defendant "on the basis of some external characteristic, rather than on the basis of the defendant's looks." *Id.* The mere fact that a defendant was the only individual to appear in both a photographic array and a subsequent live lineup does not render the pretrial identification procedure improper. *People v Currelley*, 99 Mich App 561, 568; 297 NW2d 924 (1980).

Defendant argues that the photographic arrays with his picture were unduly suggestive because he was the only person with dread locks while the other men had either braids or corn rows. The trial court stated the following regarding the photographic array:

> Four of the individuals in the array clearly have braids of some form, although two have longer braids and number 4 appears to have his hair braided closer to his head, as does that of number 6. Number one does not have braids, but his hair is fairly long. Numbers 1 through 5 all have similar facial features, while number 6 has a much fuller face. The photographs are close enough in general characteristics that they do not appear impermissibly suggestive on their face. This is borne out by the actual identifications by the witnesses. Mr[.] Figeroa was able to identify the defendant. Ms. Ba[r]ley was unable to identify anyone. . . .

A review of the photographs confirms that the trial court's factual findings were not clearly erroneous. As the trial court indicated, defendant's facial features, including his facial hair, are strikingly similar to four of the other photographed men, and defendant's skin tone is similar to four of the other men pictured. Additionally, it is difficult to distinguish the exact nature and thickness of defendant's hairstyle, i.e., dreadlocks versus braids, compared with the other men pictured in the array.

---

[1] Our Supreme Court has noted that the following differences did not render a photographic array unduly suggestive: (1) when the photographs included individuals "with different complexions and facial hair" and the photographs were not the same size; (2) when "only two of the six photographs depicted mustaches, even though the witness described the robber as having a mustache"; and (3) when four photographed individuals had facial hair and the defendant was clean shaven. *Kurylczyk*, 443 Mich at 304 n 11.

The record also indicates that Barley and Figeroa did not explicitly differentiate between the hairstyles in the photographs and did not rely on characteristics other than defendant's looks in identifying him through the photographic array and at the live lineup. When asked whether he identified the shooter in the photographic array, Figeroa stated, "I could never forget his face." Likewise, when asked what defendant's hair looked like, Barley explained, "I don't really know, like dreadlocks, braids, whatever type of hair he had on his head." In her statement to the police, Barley only mentioned that the defendant "possibly [had] braids/corn rows." Further, all of the participants in the live lineup wore caps that covered their hair, which indicates that Figeroa and Barley identified defendant on the basis of personal characteristics other than his hairstyle.

In this case, the photographic array was not "so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification" because the array contained photographs that fairly represented defendant's physical features. *Kurylczyk*, 443 Mich at 302, 304. Because the photographic array was not unduly suggestive, Figeroa's and Barley's subsequent identifications of defendant at the live lineup were not improper. Accordingly, the trial court did not err in denying defendant's motion to suppress his identification.[2]

III. REBUTTAL TESTIMONY

Defendant next argues that the trial court abused its discretion by admitting the rebuttal testimony of Jimenez to contradict Marlowe's testimony. We agree, but conclude that the error was harmless.

We review a trial court's decision to admit rebuttal testimony for an abuse of discretion. *People v Figgures*, 451 Mich 390, 398; 547 NW2d 673 (1996). An abuse of discretion occurs when a trial court "chooses an outcome that is outside the range of reasonable and principled outcomes." *People v Orr*, 275 Mich App 587, 589; 739 NW2d 385 (2007).

A trial court may admit rebuttal evidence to " 'contradict, repel, explain or disprove evidence produced by the other party and tending directly to weaken or impeach the same.' " *People v DeLano*, 318 Mich 557, 570; 28 NW2d 909 (1947), quoting *People v Utter*, 217 Mich 74, 83; 185 NW 830 (1921). "[T]he test of whether rebuttal evidence was properly admitted is not whether the evidence could have been offered in the prosecutor's case in chief, but, rather, whether the evidence is properly responsive to evidence introduced or a theory developed by the defendant." *Figgures*, 451 Mich at 399. "[E]vidence [that] is responsive to material presented by the defense . . . is properly classified as rebuttal," but "a denial cannot be elicited on cross-examination simply to facilitate the admission of new evidence." *Id.* at 399, 401.

---

[2] Because we conclude that the pretrial identification procedures were not unduly suggestive, we also conclude that the prosecutor was not required to establish an independent basis for the witnesses' in court identification of defendant. *People v McElhaney*, 215 Mich App 269, 286; 545 NW2d 18 (1996).

This Court has affirmed the following regarding the relationship between evidence of specific conduct offered to attack or bolster a witness's credibility that is inadmissible under MRE 608 and evidence that is admissible as rebuttal evidence:

> Although MRE 608(b) generally prohibits impeachment of a witness by extrinsic evidence regarding collateral, irrelevant, or immaterial matters, a party may introduce rebuttal evidence to contradict the answers elicited from a witness on cross-examination regarding matters germane to the issue if the rebuttal evidence is narrowly focused on refuting the witness'[s] statements. [*People v Spanke*, 254 Mich App 642, 644-645; 658 NW2d 504 (2003).]

In this case, although the prosecutor offered Jimenez's testimony to weaken Marlowe's testimony, Jimenez's testimony was not "properly responsive to evidence introduced or a theory developed by the defendant." *Figgures*, 451 Mich at 399. During cross-examination, Marlowe testified that she was not afraid to testify in court or to live in her neighborhood. On recross-examination, the prosecutor asked Marlowe whether she was afraid at the time she spoke with Jimenez, and Marlowe clarified in the following exchange:

> *Q.* And you did talk to him about the fear that you feel, also, Officer Jimenez, in the neighborhood, isn't that correct?
>
> *A.* Yes.
>
> *Q.* Okay.
>
> *A.* At that time.
>
> *Q.* At that time?
>
> *A.* Mm—hmm.
>
> *Q.* And you're testifying a little bit differently than you did the first time, is that fair to say?
>
> *A.* Well, I'm not afraid of the neighborhood anymore. We pretty well cleared it up.

On rebuttal, Jimenez testified that when he spoke with Marlowe on September 22, 2012, she was shaky, scared, and nervous.

Jimenez's testimony regarding Marlowe's demeanor did not contradict, repel, explain, or disprove a substantive matter about which Marlowe testified or a theory developed by the defense. Jimenez's rebuttal testimony was not germane to—and did not contradict or refute—the main issue to which Marlowe's testimony was relevant, i.e., whether defendant was the perpetrator of the crimes. Jimenez's rebuttal testimony also did not properly fall within the narrow exception that permits a prosecutor to introduce rebuttal testimony to contradict statements elicited on cross-examination. During cross-examination, Marlowe testified that she was not afraid to live in her neighborhood. However, during recross-examination, she clarified that she was afraid at the time she spoke with Jimenez, but she was no longer afraid because the

neighborhood had improved. Jimenez's testimony regarding Marlowe's demeanor did not contradict, but rather confirmed Marlowe's testimony. Further, the fear or apprehension Marlowe felt while conversing with Jimenez was not "closely bearing" on defendant's guilt or innocence. *People v LeBlanc*, 465 Mich 575, 590; 640 NW2d 246 (2002). Therefore, the trial court abused its discretion by admitting Jimenez's rebuttal testimony.

However, reversal of defendant's convictions is not required because the trial court's error was harmless. MCL 769.26 provides the following:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of . . . the improper admission or rejection of evidence . . . unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.

An evidentiary error related to rebuttal testimony is a nonconstitutional error, as the purpose of limiting rebuttal testimony is to "preclude the trial from turning into a trial of secondary issues," and not to protect the constitutional rights of the defendant. *Figgures*, 451 Mich at 398. As a result, the error in this case " 'is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative.' " *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010), quoting *People v Krueger*, 466 Mich 50, 54; 643 NW2d 223 (2002). In determining whether an error was prejudicial, we consider the weight of the error compared with the strength of the untainted evidence. *Feezel*, 486 Mich at 192.

In this case, it is not more probable than not that the trial court's error was outcome determinative. The prosecution introduced significant untainted evidence against defendant. Figeroa testified that defendant fired multiple gunshots at Barley's car, killing Cuevas and injuring Barley and Figeroa. Barley testified that defendant was standing across the street holding a gun after the shots were fired. Figeroa testified that defendant continued shooting at him after he exited Barley's vehicle, and that defendant shot him in the face when he turned around to look at defendant. Jimenez's rebuttal testimony was brief and did not explicitly contradict Marlowe's substantive testimony because it only addressed Marlowe's demeanor after the incident. Contrary to defendant's argument on appeal, Jimenez's testimony did not imply that defendant frightened Marlowe or that Marlowe fabricated her testimony at defendant's behest. Given the strength of the untainted evidence, it is unlikely that Jimenez's rebuttal testimony was outcome determinative. Accordingly, the trial court's error was harmless and defendant is not entitled to a new trial.

IV. CONSECUTIVE SENTENCE

Finally, defendant argues that the trial court erred by ruling that the sentence imposed for his felony-firearm conviction must be served consecutive to the sentences imposed for his assault with intent to commit murder convictions. Defendant did not raise this issue below, so it is unpreserved for appeal. *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). We review unpreserved claims for plain error affecting substantial rights, which "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

Under Michigan law, "[a] consecutive sentence may be imposed only if specifically authorized by statute." *People v Lee*, 233 Mich App 403, 405; 592 NW2d 779 (1999). MCL 750.227b(1)-(2), the felony-firearm statute, provides the following:

> (1) A person who carries or has in his or her possession a firearm when he or she commits or attempts to commit a felony . . . shall be imprisoned for 2 years. . . .

> (2) A term of imprisonment prescribed by this section is in addition to the sentence imposed for the conviction of the felony or the attempt to commit the felony, and shall be served consecutively with and preceding any term of imprisonment imposed for the conviction of the felony or attempt to commit the felony.

Our Supreme Court has interpreted MCL 750.227b(2) and held that "the Legislature intended that a felony-firearm sentence be consecutive only to the sentence for a specific underlying felony." *People v Clark*, 463 Mich 459, 463; 619 NW2d 538 (2000). The "felony" referenced in subsection 2 "refers back to the predicate offense discussed in subsection 1, i.e., the offense during which the defendant possessed a firearm." *Id*. at 464. Therefore, the felony-firearm statute only permits a trial court to impose a sentence for a felony-firearm conviction consecutive with the sentence for a charged predicate offense. *Id*.

In this case, the amended information indicates that defendant's first-degree murder charge was the only predicate felony for his felony-firearm charge. The prosecutor did not file separate felony-firearm charges for either count of assault with intent to commit murder. Accordingly, the trial court erred in imposing defendant's felony-firearm sentence consecutive with the sentences for his assault with intent to commit murder convictions. Both parties agree that this matter should be remanded to correct the judgment of sentence, so it is unnecessary to determine whether defendant was prejudiced by the trial court's error.

We affirm defendant's convictions and sentences, but remand for the ministerial task of amending the judgment of sentence to indicate that the sentence imposed for defendant's felony-firearm conviction should be served consecutive to the sentence imposed for his first-degree murder conviction and concurrent with the sentences imposed for his assault with intent to commit murder convictions.

/s/ Karen M. Fort Hood
/s/ Kathleen Jansen
/s/ Michael F. Gadola